UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**LEITIA PATTON,**

      Plaintiff,

v.

Case No. 15-cv-21

Hon. Paul L. Maloney

**HZ JDB, INC. and HZ CNAC, INC.,**

      Defendants

Collin H. Nyeholt (P74132)
FIXEL & NYEHOLT, PLLC
Attorney for the Plaintiff
4084 Okemos Road, Suite B
Okemos, MI 48864
(517) 332-3390
(517) 853-0434 (fax)
cnyeholt@fixellawoffices.com

Leigh M. Schultz (P71038)
James D. Bourides (P77717)
MILLER, CANFIELD, PADDOCK
& STONE, P.L.C.
Attorneys for the Defendants
277 S. Rose Street, Ste. 5000
Kalamazoo, MI 49007
(269) 381-7030
schultzl@millercanfield.com

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO
COMPEL ARBITRATION OR, IN THE ALTERNATIVE, DISMISS THE COMPLAINT**

## Table of Contents

Table of Contents ................................................................................................................. ii

Table of Authorities ............................................................................................................. iii

Standard of Review ............................................................................................................... 1

Counter-Statement of Facts .................................................................................................. 1

Argument .............................................................................................................................. 5

    I.    The Court Should DENY the Defendants' Motion to Compel Arbitration .............. 5

    II.   The Court Should DENY the Defendants' Motion to Dismiss Plaintiff's FDCPA
         Claim ...................................................................................................................... 11

    III.  The Court Should DENY Defendant's Motion to Dismiss Plaintiff's Michigan
         Collection Practices Act Claim ............................................................................. 14

    IV.  Plaintiff's FCRA Claim Should Not be Dismissed ............................................... 18

Conclusion .......................................................................................................................... 20

# Table of Authorities

## Cases

*Bratt Enters, Inc. v. Noble Int'l Ltd.*, 338 F.3d 609 (6th Cir. 2003) ...............................5,8

*Conley v. Gibson,* 355 U.S. 41 (1957) ...................................................................1

*DiPonio Const. Co. v. Rosati Masonry Co., Inc.*, 246 Mich.App. 43 (2001) ...........................18

*Downs v. Clayton Homes, Inc.,* 88 F.App'x 851 (6th Cir. 2004) .................................19

*Gamby v. Equifax*, 462 Fed.Appx. 552 (6th Cir. 2012) .................................................15

*Glassner v. R.J. Reynolds Tobacco Co.,* 223 F.3d 343 (6th Cir.2001) ......................................1

*Hishon v. King & Spalding,* 467 U.S. 69 (1984) .......................................................1

*Jones v. City of Carlisle,* 3 F.3d 945 (6th Cir.1993) ....................................................1

*Morgan v. Church's Fried Chicken,* 829 F.2d 10 (6th Cir.1987) .................................1

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983) ............................5

*Nestle Waters North Am., Inc. v. Bollman*, 505 F.3d 498 (6th Cir. 2007) ...................................5

*Purnell v. Arrow Financial Services, LLC*, 303 Fed.Appx. 297 (6th Cir. 2008) ........................13

*Rosema v. Potter*, 2008 WL 4426335 (WDMI 2008) ..................................................1

*Schreiber v. Loews's, Inc.*, 147 F.Supp. 319 (WDMI 1957) ......................................17

*Turi v. Main Street Adoption Services, LLP,* 633 F.3d 496 (6th Cir. 2011) ......................*passim*

*Watson Wyatt & Co. v. SBC Holdings, Inc.*, 513 F.3d 646 (6th Cir. 2008)................................5

## Statutes

15 USC § 1692a(6) ..................................................................................12

MCL 445.251 ......................................................................................14,15

MCL 445.251 ......................................................................................15,16

MCL 445.257 ..........................................................................................17

MCL 600.5813 ........................................................................................................................18

**Court Rules**

Fed.R.Civ.Pr. 12(b)(6) ...........................................................................................................1

**STANDARD OF REVIEW**

Defendants premise their bid for dismissal of the claim on Fed.R.Civ.Pr. 12(b)(6).  Under Rule 12(b)(6), a complaint may be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The standard requires that a "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Glassner v. R.J. Reynolds Tobacco Co.,* 223 F.3d 343, 346 (6th Cir.2001). The complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987). A complaint fails to state a claim upon which relief can be granted when it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. *Jones v. City of Carlisle,* 3 F.3d 945, 947 (6th Cir.1993).  *See also Rosema v. Potter*, 2008 WL 4426335, at *4 (W.D. Mich. Sept. 26, 2008)

**COUNTER-STATEMENT OF FACTS**

The Defendants' recitation of the facts of the case is a marvel of revisionism.  It is true that, in May of 2008, Plaintiff Patton was lead to believe that she had purchased an automobile from an entity known to her as JD Byrider of Kalamazoo.  (Def's Brief, RE 7, PageID 38; Comp., RE 1, PageID 2 at ¶ 7.)  However, what the Defendants fail to mention is that, contrary to Michigan law, they never actually transferred the title to the van to her name.  Seven months after the purported purchase of the vehicle, in early 2009, Patton attempted to renew the vehicle's license plate with the Secretary of State and discovered, at this time, that it had never

1

been transferred to her name. (Comp, RE 1, PageID 3 at ¶ 10.) Patton immediately contacted her salesperson and, receiving no response from him, escalated to JD Byrider – Kalamazoo's Manager, Royce Bellamy. (*Id.* at ¶ 13.) Patton became dissatisfied with Defendants' handling of the situation and, rightly, ceased making payments on the vehicle at this time. Bellamy demanded that Patton sign additional documents and even threatened *her* with suit. *Id.* In response to Defendant's Manager's threats, Patton got the Michigan Attorney General's office involved. (*Id.* at ¶ 14.) The Michigan Attorney General found in Patton's favor and noted that the Defendant *had* violated Michigan law by failing to transfer the plate to her name. (Comp's Ex. B, May 11, 2009 letter from Investigator J. Carlson, RE 1-2, Page ID 15.) The parties, eventually, resolved the dispute by agreeing that Patton would return the vehicle to Byrider's possession. (Comp., RE 1, PageID 3 at ¶ 13.) She did so on March 26, 2009. This should have ended the dealings between the parties.

But, that is not what happened. In July of 2010, Plaintiff Patton attempted to purchase another vehicle from a different seller. (Comp, RE 1, PageID 4 at ¶ 16.) Her new dealer pulled her credit information. It was discovered, at this time, that on or about May 1 of 2008, Defendant had reported to the various credit reporting agencies that Plaintiff Patton owed a debt of $11,718, related to the van and that this debt showed up as "unpaid." (Comp's Ex.C, RE 1-3, PageID 17.) Patton's new salesperson called Defendant and spoke to Manager Royce Bellamy, Defendant's manager who had previously threatened to sue Patton because Byrider had not transferred title to the van to her name. (Comp, RE 1, PageID 4 at ¶ 16.) Bellamy became rude and strident, stating "we did you a favor by financing you to begin with" and expressly *refused* to remove or correct the erroneous debt that was indicated on the credit report. *Id.* As a result of this untruthful information on her credit report, which Defendant's manager *refused* to

2

appropriately correct, Patton did not qualify for conventional financing on the vehicle.  (*Id.* at ¶ 17.)  She acquired the vehicle through a costly 54 month "lease" through the dealership and, eventually, paid an additional $12,000 in financing charges.  *Id.*

After this conversation with Manager Bellamy in July of 2010, Patton repeatedly directed correspondence to the Defendants in order to try to correct the incorrectly reported information on her credit report.  (*Id.* at at PageID 4-5, ¶¶ 18-25.)  Defendants consistently gave Patton evasive responses, or no response at all.  In April of 2013, an employee of Defendants' named "Melissa" told Patton that her account was "closed" and that there was no account information. (*Id.*, PageID 5 at ¶ 21.)  On January 26, 2014 Plaintiff again pulled her credit information and found that, contrary to "Melissa's" representation that the account was "closed," that Defendants had *recently* reported the debt.  (*Id.* at ¶ 22.)  Defendants had, according to the credit report she received, reported the $11,718 debt to Equifax on *December 1, 2013* and to Experian on *January 10, 2014*.  (*Id.*; Comp's Ex. C, RE 1-3, PageID 17.)

Defendants ignore this salient fact, but her client has admitted, in *writing*, to its own wrongdoing.  On January 27, 2014 Patton contacted Defendants' manager named Doug Bardt. (Comp, RE 1, PageID 5 at ¶ 23.)  On March 3, 2014, presumably in response to Patton's call to Bardt, Defendants' Collections Manager Jerri Shaw drafted a letter on Patton's.  (Shaw Letter, Comp. Ex. A, RE 1-1, Page ID 13.)  Defendants' manager, writing on letterhead bearing the logos of "JD Byrider" and "CNAC," stated the following:

> This letter is in regards to Leitia Patton account #2187878 for 2002 Dodge Caravan Vin# 1B4GP25B52B519579.  ***This vehicle was never titled in her name. The loan was misreported to the credit bureaus***.  This account is reported as paid in full.  Ms. Patton is not financially obligated for any money towards this account.  We have changed the reporting to the credit bureaus on 3/3/2014.  If you have any further questions, feel free to contact my office.  (*Id., **emphasis** added.*)

3

Finally, after years of runaround from Defendants JD Byrider and CNAC, they have admitted that the "loan was misrepresented to the credit bureaus" because "this vehicle was never titled in her name." *Id.* However, Patton has suffered compensable damages. She overpaid, significantly, for a loan because Defendants "misreported to the credit bureaus" a loan for a vehicle that "was never titled in her name." Further, Defendants' manager, Bellamy, was made aware that the loan was misreported to the credit bureaus, but expressly *refused* to take any steps to correct the inaccuracy, rudely stating that he had "done her a favor by financing her in the first place." The circumstances indicate, quite clearly, that the loan was "misreported to the credit bureaus" willfully and maliciously.

Even after Defendants' manager *admitted* that the "loan was misrepresented to the credit bureaus," Defendants failed to correct the inaccurate reporting. In June of 2014, Patton called Defendants' main line and spoke to another employee named "Geneva." (Proposed Am. Comp. at ¶ 37.) Geneva indicated that the account *still showed as opened* and that, in light of the letter from Bellamy, was "not right." *Id.* "Geneva" promised to get back to Patton in seven days but never did. Patton complained, numerous times, to the Credit Bureaus during the year 2014. (Proposed. Am. Comp. at Ex. F.) In response to one of her complaints to Equifax, Plaintiff learned that Defendants had *confirmed that the account was open, had 30 days late payment status, and was charged off.* (Proposed. Am. Comp. at Ex. G.)

The fact that Defendants' manager has *admitted* that the "loan was misrepresented" and the strong showing that this "misrepresentation" was intentional, willful, and malicious should be recalled when evaluating the Defendants' argument that Patton has not stated a claim for violation of the consumer protection laws invoked in this suit. As should the fact that

4

Defendants have *confirmed the debt* to the Credit Bureaus, even *after* Defendants admitted it was "misrepresented."

## ARGUMENT

**I.     The Court Should DENY the Defendants' Motion to Compel Arbitration.**

It is true that in the Federal Arbitration Act, Congress has expressed "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). However, "[t]his policy is not so broad that it compels the arbitration of issues not within the scope of the parties' arbitration agreement." *Watson Wyatt & Co. v. SBC Holdings, Inc.*, 513 F.3d 646, 649 (6th Cir. 2008) (*citing Nestle Waters North Am., Inc. v. Bollman*, 505 F.3d 498, 504 (6th Cir. 2007); *Bratt Enters, Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 613 (6th Cir. 2003)). "Before compelling an unwilling party to arbitrate, [a] court must engage in a limited review to determine whether a dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that ***the specific dispute falls within the substantive scope of that agreement***." (*Ibid, emphasis* added.) While it is true that "the question of whether a particular dispute is arbitrable is distinct from the issue of who should decide that question" the Sixth Circuit has held that "even where the parties expressly delegate to the arbitrator the authority to decide the arbitrability of the claims related to the parties' arbitration agreement, this delegation applies only to claims that are at least *arguably* covered by the agreement." *Turi v. Main Street Adoption Services, LLP*, 633 F.3d 496, 511 (6th Cir. 2011).

> **a.  Defendants' Arbitration Clause was limited to "Disputes over the interpretation, scope, or validity of this agreement" and plainly does not encompass the statutory violations at issue in this lawsuit.**

Defendants argue that "the parties' arbitration agreement is extremely broad and covers the claims in this case." (Def's Brief, RE 7, PageID 41-46.) They are incorrect. The language

of the agreement provides that the arbitration procedure only "includes any Dispute [as defined in the agreement] over the interpretation, scope, or validity of this agreement." This language, contrary to Defendants' assertion, would not encompass the statutory claims at bar.

Defendants' counsel provides a lengthy recitation of the Arbitration Agreement's contractual definition of the word "Dispute." The only language from the Agreement that the Court need concern itself with is the following:

> Unless otherwise stated in this agreement, any "Dispute" between the parties shall, at the election of Buyer, Seller, or Seller's Assignee ("the Parties"), be resolved by a neutral, binding arbitration, and not by a court of law. ***This procedure includes any Dispute over the interpretation, scope, or validity of this Contract, the arbitration agreement or the arbitrability of any issue,*** with the sole exception of the Parties' waiver of any right to bring a class action or to participate in a class action as provided under paragraph G shall be solely determined by the appropriate court, if necessary. (Arb. Agreement, RE 7, PageID 62.)

Reading this document as a whole, as the parties must,[1] the second sentence of this paragraph modifies, and limits, the first. It should be noted that the phrase is "this procedure includes" and *not* "this procedure includes, *but is not limited to*." The absence of the phrase "includes, *but is not limited to*" would lead a reasonable reader to believe that the phrase was intended as limitation, not inclusion. "Disputes" are to be submitted to arbitration, and this procedure includes (and, apparently, *is* limited to) "any Dispute over the interpretation, scope, or validity of this contract, the arbitration agreement or the arbitrability of any issue." The only real question the Court need answer is whether the instant claim is a "Dispute" *over the interpretation, scope, or validity of this Contract, the arbitration agreement or the arbitrability of any issue.* This lawsuit, seeking damages for the Defendants for post-contracting statutory violations, is not. This reasoning finds support in the analytical framework the Sixth Circuit used in *Turi v. Main Street Adoptions,* 633 F.3d 496.

---

[1] Def's Brief, RE 7, PageID 44 (quoting various authorities for this proposition.)

> **b. Under *Turi*'s reasoning, statutory claims fall outside of the scope of arbitration agreements limited to arbitration of contract claims.  Defendant's attempt to distinguish *Turi* fails.**

*Turi v. Main Street Adoptions*, 633 F.3d 496 was a multi-plaintiff claim against an international adoption agency pursuant to the RICO act.  The *Turi* plaintiffs alleged that the defendants had caused them to pay various fees to the defendants for international adoptions based on misstatements in their advertising and correspondence as to their abilities to complete international adoptions.  They alleged that these repeated and consistent misrepresentations demonstrated serial violations of the federal mail and wire fraud statutes and, therefore, constituted a pattern of racketeering activity in violation of the RICO.  The Mainstreet defendants pointed to an arbitration agreement requiring the arbitration of "a claim regarding fees charged by us."  The defendants' position was that, because the thrust of the RICO claim was that the payment of fees was based on false statements, this *was* a "claim regarding fees" that fell under the scope of the arbitration agreement.  "If it walks like a duck and quacks like a duck," argued Mainstreet's counsel at oral argument on the Motion to Dismiss, "it must be a duck.[2]"  The District Court rejected the "if it walks like a duck" argument, stating that

> [i]n this case, certainly the plaintiffs seek to recover fees paid, presumably in their unjust enrichment count, *but they also allege fraud, conspiracy, misrepresentation, and violations of RICO, and they are claiming that the defendants' tortious conduct caused them injuries beyond the fees charged.  None of this can be characterized properly as a 'claim regarding fees charged by us.* (**Ex. A,** Op.and Order of Trial Court, ED MI Case No. 8-cv-14511, Doc. #35 at p. 31 of 34.)

In other words, the language of the arbitration agreement in *Turi* said it would extend to any claim regarding "payment of fees."  There was a colorable argument to be made that the "claim regarding fees" would include a statutory RICO claim, based on fees paid under false pretenses.

---

[2] Fixel Law Offices, the predecessor firm to Fixel and Nyeholt PLLC, was the Plaintiffs' attorney in *Turi*.  Attorney Nyeholt, the undersigned, was employed by FLO as a Law Clerk at this time and attended oral argument and heard this statement made.

The Trial Court rejected this argument because it viewed a "claim regarding fees" as being limited to contractual disputes, but not extending to broader claims of statutory violations. Mainstreet appealed this determination to the Sixth Circuit.   On Mainstreet's appeal, the Sixth Circuit affirmed this reasoning, noting that

> [t]he plaintiffs' claims for RICO violations, civil conspiracy, fraudulent misrepresentation, innocent misrepresentation, intentional infliction of emotional distress, and negligent infliction of emotional distress all plausibly seek damages beyond restitution for fees paid to Main Street. Other than fees, the plaintiffs' alleged damages include the time and (nonfee) resources that they invested in pursuing their adoptions, treble damages under RICO, loss of employment and housing, and various emotional damages. These claims do more than merely recast the plaintiffs' claims for fees; they seek damages based on Main Street's alleged fraud that are separate from the fees paid to Main Street. Because the relevant provisions of the arbitration clause refer only to claims regarding fees and not to other types of claims, "as an initial matter, it is clear that [the plaintiffs' nonfee claims] are not within the scope of any general or specific arbitration provision." *See Simon,* 398 F.3d at 776. And even if the plaintiffs' fee and nonfee claims "arise from the same factual underpinnings ..., it does not necessarily follow that the [nonfee] claims must also be arbitrated. The question of whether or not [the nonfee] claims share facts with the arbitrable claims is not necessarily determinative of arbitrability of the [nonfee] claims."

*Turi v. Main St. Adoption Servs., LLP*, 633 F.3d 496, 510 (6th Cir. 2011).

*Turi* was not the only case to refuse to find a claim at bar within the scope of an arbitration agreement.  As Hon. Lawson noted in his Opinion,

> In *Bratt Enterprises*, the Sixth Circuit held that an agreement that required arbitration of any disagreement "with any of the amounts included in the Closing Balance Sheet" did not apply to a dispute over who was liable for the amounts owed, even though determining the persons responsible for payment is an inherent part of any payment plan. **Ex. A**, *Turi* Op., ED MI Case No. 08-cv-14511, Doc 35 at Page 33 of 34 (citing *Bratt Ent. v. Noble Intern. Ltd.*, 338 F.3d 609, 614 (6th Cir. 2003).

In *Bratt,* as in *Turi,* the Court looked to the specific language of the arbitration agreement to determine if the language included the case at bar.  The contract in *Bratt,* like the contract in *Turi*, did not state "any and all claims shall be arbitrated" but it contained limiting language. Even though the case at bar in *Bratt,* arguably, had some connection to the disputes articulated in

8

the arbitration agreement, this was not enough to divest the plaintiff of his right to a federal forum and submit the claim to arbitration.

*Bratt* and *Turi* counsel that, despite the strong presumption in favor of arbitration, a court will not stretch the language in an arbitration clause to include claims that are arguably related to the language but not expressly within it. *Turi's* claim for RICO damages based on fee payments was, arguably, a "dispute regarding fees." But, the Court would not extend the language requiring "disputes regarding fees" to statutory claims involving damages based on payment of fees. *Bratt's* dispute over who was liable for amounts owed required determination for payment inherent in the payment plan in the Closing Balance Sheet. But, the Court would not force that dispute to arbitration based on language requiring arbitration of any disagreement "with any of the amounts included in the Closing Balance Sheet." Even though there is a broad presumption of arbitration, the Court does not read into an arbitration agreement things that it does not specifically say. If the agreement does not say it's a "duck," it isn't a "duck," even if it "walks and talks like a duck."

The arbitration procedure Plaintiff Patton agreed to "includes any Dispute over the interpretation, scope, or validity of this Contract." The language Patton agreed to would, undoubtedly, preclude Patton from maintaining a breach of contract action against the Defendants because that claim would be a Dispute over the "interpretation, scope, or validity of the contract." However, Patton has not sued for breach of contract. She has sued Defendants for post formation conduct that constituted violations of her rights under statutory law. The question is whether Patton's statutory claims, related to the Defendants' violation of consumer protection law in the malicious misreporting of her debt to the credit bureaus, is a Dispute over the

"interpretation, scope, or validity of the contract."  Applying *Turi's* reasoning, as well as *Bratt's,*
we see that the answer is no.

      **c.  Per *Turi,* this Court May Decide the Arbitrability of the Limited Arbitration Clause because the instant claim is outside of the arbitration agreement.**

What about the second part of the sentence, requiring arbitration of any "[d]isupte …
over .. the arbitrability of any issue?"  The other question, fairly raised, is whether this Court
may determine the question of the arbitrability of the dispute.  Indeed, Defendants raise this point
in their brief, stating that this section "means that even if Plaintiff contests the validity or scope
of the [Arbitration] Agreement, these matters are still for the arbitrator to decide, not the court."
(Def's Brief, RE 7, PageID 45.)  Defendants, however, ignore the fact that he *Turi* Court was
faced with an identical argument and conclusively ruled against it.

In *Turi*, Mainstreet's counsel argued, as Defendants' does in the instant, that the Trial
Court should not have even been allowed to decide the question of the arbitrability of the
agreement because this determination was reserved for the arbitrator.   The Sixth Circuit
acknowledged that "the question of who should decide the scope of an arbitration clause is
distinct from the question of whether a particular issue is in fact subject to arbitration."  *Turi*, 633
F.3d at 506 (citations omitted).   Despite this fact, the Sixth Circuit rejected this argument
because

> [e]ven if we assume that the parties in the present case delegated to the arbitrator
> the authority to decide the scope of their arbitration clause, the plaintiffs correctly
> point out that this delegation would not be unlimited.  ***A dispute that plainly has
> nothing to do with the subject matter of an arbitration agreement, for example,
> would not give the arbitrator the authority to decide the arbitrability of this
> wholly unrelated claim.***  *Id.*

After some additional discussion, the Sixth Circuit ultimately held that "even where the parties
expressly delegate to the arbitrator the authority to decide the arbitrability of the claims related to

the parties' arbitration agreement, this delegation applies only to claims that are at least *arguably* covered by the agreement." (*Id.* at 511 (*emphasis* original)). In other words, *Turi* holds that, when a claim before the Court is not within the scope of the arbitration agreement, the parties need not have an arbitrator decide whether the dispute is arbitrable, *even if the agreement says an arbitrator should decide the question of arbitrability.*

In the instant case, as in *Turi*, the claim at bar is wholly unrelated to the arbitration agreement. The arbitration agreement applies to "*Disputes over the interpretation, scope, or validity of this Contract.*" As in *Turi,* this claim for post-formation violations of statute is not even *arguably* covered by the language of the agreement. As such, per *Turi*, the parties' delegation to the arbitrator to determine arbitrability of the dispute does not apply.

## II.     The Court Should DENY the Defendants' Motion to Dismiss Plaintiff's FDCPA Claim.

As an alternative to their request for an order compelling arbitration, the Defendants request the Court to dismiss the claim entirely. With respect to the FDCPA count, the Defendants raise two arguments in support of dismissal of Plaintiff's FDCPA claim. They first claim that they are not "debt collectors" and, therefore, not subject to the FDCPA. They claim second that, even if they are "debt collectors," the claim is time barred. Both arguments lack merit. However, with respect to the "debt collector" argument, Plaintiff will seek to amend the Complaint to state additional allegations in support of her argument that the Defendants satisfy the statutory definition of "debt collectors" subject to the provisions of the Act.

### a.   The Defendants are "Debt Collectors" as defined by the FDCPA.

Plaintiff agrees that 15 USC § 1692a(6) governs the determination of whether the Defendants are "debt collectors" subject to the provisions of the FDCPA. Defendants ignore a key section of the statute, which provides that

> Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts.  15 USC § 1692a(6).

The facts indicate that this definition applies in the instant case.  The Seller for the van in question, per the Retail Installment and Security Agreement, was "HZ JDB Inc. d/b/a JD Byrider."  (Agreement, RE 7, PageID 59.)  Defendant HZ JDB, Inc. uses an assumed name, "JD Byrider," to collect its debts.  The Sales Contract and Security Agreement was "assigned to HZ CNAC, Inc. d/b/a CNAC" "under the terms of a separate agreement."  *Id.*  Defendant HZ CNAC uses an assumed name to collect its debts.  When the defendants reported Patton's debt to the credit reporting agencies, they reported that the debt was owed to an entity identified, at certain times, as "CNAC MI105" and, at other times, as "CNAC MI112"  (Comp's Ex. C, RE 1-3, PageID 17.)  The debt for the vehicle was reported to the credit reporting agencies under assumed names, "CNAC MI105" and "CNAC MI112."  Plainly, the holder of the note has used a name other than its own which would indicate that a third person is collecting or attempting to collect the debt owed by Patton.  Therefore, the Defendants qualify as "debt collectors" pursuant to 15 USC § 1692a(6).

### b. A discrete FDCPA violation occurred within the one year limitations period, the claim is not barred by the statute of limitations.

The Sixth Circuit has noted that the FDCPA "provides that an action to enforce liability under the FDCPA may be brought within one year from the date on which the violation occurs." *Purnell v. Arrow Financial Services, LLC*, 303 Fed.Appx. 297 (6th Cir. 2008) (citations and internal quotations omitted.)  The Court in *Purnell* considered a situation, similar to the instant, where there was a series of discrete violations of the FDCPA, some of which occurred outside of the limitations period, and some of which occurred within the limitations period.  In *Purnell,*

much as the instant, the Plaintiff's claim was that the debt collector had, at several points in time, falsely represented to a credit reporting agency that he owed a debt when, in fact, he didn't in violation of the FDCPA.   Some of these representations occurred outside of the limitations period, but some occurred within the one-year period.   The defendants advanced the position that, because some FDCPA violations occurred outside of the limitations period, the entire claim was time barred.   The Sixth Circuit rejected this contention and ruled that "[t]o the extent that these violations are alleged to have occurred outside the limitations period, they are barred by the statute of limitations. But, to the extent that plaintiff can prove that such violations occurred within the limitations period, they are not time-barred.  *Id.* at 303. (6th Cir. 2008).  *Purnell* also claimed, much as Patton does herein, that the debt collector violated the FDCPA by reporting debts to the credit reporting agencies without noting his dispute of the debt or validating the debt. Again, the Sixth Circuit ruled that "each failure to cease collection activity without having validated the debt … presents a discrete violation of the FDCPA such that only those collection activities taken outside the limitations period would be time-barred."

Leitia Patton tried, repeatedly, to tell the Defendants that they had misreported the status of her "debt" to them.   Their manager, in fact, admitted *in writing* that the "loan was misrepresented to the credit bureaus" because "this vehicle was never titled in her name." Patton's credit report, attached to the Complaint as Exhibit C, indicates that this inaccurate information was reported to Experian on January 10, 2014.  (Exhibit, RE 1-3, PageID 17; Comp., RE 1, PageID 5 at ¶ 22.)  Defendants likewise affirmed the debt, claimed it had a status of "30 days late," and indicated it was "charged off" (all inaccurately) to Equifax on or about August 13, 2014.  (Am.Comp's Ex. G.)  This was a discrete act and a clear violation of the FDCPA.

Patton's Complaint, filed on January 8, 2015, was within the one year limitation period.  Her FDCPA claim was timely and is not subject to dismissal.


### III.   The Court Should DENY Defendants' Motion to Dismiss Plaintiff's Michigan Collection Practices Act Claim.

Plaintiff's Complaint, much to the embarrassment of the undersigned, contains a not-insignificant clerical error.  Plaintiff captioned a count of "Violation of the Michigan Collection Practices Act, MCL 339.901."  The Michigan Collection Practices Act is codified as MCL 445.251 *et seq,* the Michigan Occupational Code is MCL 339.901 et seq.  Defendants inferred that Plaintiff intended to bring a claim under the Michigan Occupational Code.  Their confusion is justified by the clerical error in the pleading, but Plaintiff intended the claim under the Michigan Collection Practices Act.  The difference is important because the Occupational Code does not pertain to actions of individuals collecting their own debts while the Collection Practices Act does.  Plaintiff herein seeks leave to amend to state a claim under the Michigan Collection Practices Act, MCL *445.251, et seq.*

### a.  Defendants are Regulated Persons under the MCPA.

Michigan's Collection Practices Act, MCL 445.251 *et seq*, applies to the Defendants' activities.  MCL 445.251(b) defines a "Collection agency" to refer to "a person directly or indirectly engaged in soliciting a claim for collection or collecting or attempting to collect a claim owed or due or asserted to be owed or due another, or repossessing or attempting to repossess a thing of value owed or due or asserted to be owed or due another person, arising out of an expressed or implied agreement."  MCL 445.251(g)(i) goes on to say that a "Regulated person" "means a person whose collection activities are confined and are directly related to the operation of a business ***other than that of a collection agency*** including … [a] regular employee

when collecting for 1 employer if the collection efforts are carried on in the name of the employer." More particularly, MCL 445.251(g)(vi) applies the definition of "regulated person" to include a "licensee under Act No. 21 of the Public Acts of 1939" which pertains to person in the State of Michigan in the business of making loans, including vehicle loans. The use of the word "person" does not limit the Act applicability to individuals because MCL 445.251(f) tells us a "Person," as used in the Act, "means an individual, sole proprietorship, partnership, association, or corporation."

All told, Defendants HZ JDB, Inc. and HZ CNAC, Inc. are "regulated persons" under the Michigan Collection Practices Act. They are entities that engage in collection activities directly related to their own business, other than that of a collection agency. Further, they are involved in the making of loans in the State of Michigan, which subjects them to the requirements of Act No. 21 of the Public Acts of 1939. And, they both employ at least one person who engages in collection activities on their behalf.

**b. Defendants violated the MCPA and Plaintiff is entitled to statutory damages.**

MCL 445.252 sets forth standards of conduct for regulated persons, including the defendants, stating that "[a] ***regulated person*** shall not commit 1 or more of the following acts[.]" MCL 445.252(e) prohibits a ***regulated person*** from "[m]aking an inaccurate, misleading, untrue, or deceptive statement or claim in a communication to collect a debt[.]" The Sixth Circuit has found a violation of this regulation where a collector makes false misrepresentations that a debt is owed when it is not. *Gamby v. Equifax*, 462 Fed.Appx. 552 (6th Cir. 2012). Further, the Sixth Circuit interpreted the MCPA as a "strict liability statute" and held that putative debtors were not required to prove that the collector knew that its representations

regarding their debt were false or misleading at the time it attempted to collect a debt that the debtors did not owe in order to recover damages.  *Id.*

The Defendants violated this provision in their dealing with Plaintiff when they knowingly, and repeatedly "misrepresented to the credit bureaus" a loan on a vehicle that "was never titled in her name."  (Comp's Ex. A, RE 1-1, PageID 12.)  According to the credit bureaus' records, this incorrect and untruthful statement was first reported to Experian and Equifax on May 1, 2008 and reported to TransUnion on May 6, 2008.  (Comp's Ex. C, RE 1-3, PageID 17.) Defendants' manager, Royce Bellamy, approved and ratified this incorrectly reported information when he was made aware of the inaccuracy in July of 2010 and he refused to take any steps to correct the inaccuracy, saying "we did her a favor by financing her."  (Comp, RE 1, PageID 4 at ¶ 16.)  Further, records reveal that Defendants reaffirmed the loan to TransUnion on March 20, 2009, to Equifax on December 1, 2013, and to Experian on January 10, 2014.  As late as August 13, 2014, even after Bellamy's letter, Defendants confirmed this account with Equifax.  Plainly, the Defendants have repeatedly and egregiously violated MCL 445.252(e)'s prohibition on making inaccurate, misleading, untrue, or deceptive statements or claims in a communication to collect a debt.

A *regulated person* is also prohibited from "[f]ailing to implement a procedure designed to prevent a violation by an employee."  MCL 445.252(q).  Defendants' failure in this respect is manifold.  The "loan was misrepresented to the credit bureaus" because "this vehicle was never titled in her name."  (Comp's Ex. A, RE 1-1, PageID 13.)  Leitia Patton contacted Royce Bellamy, Defendant's manager, in July of 2010, apprized him that the information on her credit report had been misreported.  (Comp., RE 1, PageID 4 at ¶ 16.)  He failed and, in fact, *refused* to correct the misrepresentation.  *Id.*  In August 2010, Plaintiff called JD Byrider again about the

16

misrepresentation on her credit.  (*Id.* at ¶ 19.)  Nothing was done to correct the misrepresentation. In 2012, Plaintiff contacted the defendants through their website.  (*Id.* at ¶ 20.)  In April of 2013, Plaintiff called and spoke to another employee, Melissa, and demanded action to correct the inaccurate report.  (*Id.* at ¶ 21.)  Despite these efforts on her part, the Defendants reaffirmed the debt to Equifax on December 1, 2013 and to Experian on January 10, 2014.  Even after Defendants' manager wrote and signed a letter for Patton, admitting that the debt never should h have been reported, the error continued.  Patton demanded an investigation of the account through Equifax and Defendants reaffirmed that the account had been opened.  (Am. Comp at ¶ 38; Comp's Ex. G.)  When Plaintiff called Defendants on or about June 24, 2014 "Geneva," Defendants' employee, confirmed that the account was showing as "open" in their system.  (Am. Comp. at ¶ 38.)  Plainly, the Defendants have failed, utterly, in their obligation to implement procedures designed to prevent violations by an employee.  They can't even correct a debt in their own system after their own managers admit they have erred!

MCL 445.257 affords Patton a right to a civil action for actual damages, attorney's fees, and court costs.  She may also recover a civil fine of not less than 3 times her actual damages, because the Defendants' violation was willful, per MCL 445.257.

### c. The limitations period for the MCPA claim is 6 years.  Plaintiff's January 8, 2015 Complaint was timely.

Contrary to Defendants' assertions, Michigan statutory causes of action that do not contain an explicit limitations period do not borrow from an analogous federal law suit.  State law governs as to the period of limitations, and decisions of the state courts should be followed by the federal court to determine what limitations period applies.  *See, eg Schreiber v. Loews's, Inc.*, 147 F.Supp. 319 (WDMI 1957).  MCL 600.5813 provides that "[a]ll other actions shall be commenced within the period of 6 years after the claims accrue and not afterwards unless a

different period is stated in the statutes."   A civil cause of action arising from a statutory violation is subject to the six-year limitation period found in this statute governing "other personal actions," if the statute itself does not provide a limitation period.   *DiPonio Const. Co. v. Rosati Masonry Co., Inc.*, 246 Mich.App. 43 (2001).   The Michigan Collection Practices Act does not itself contain a limitation period.   Therefore, the "catch-all" from MCL 600.5813 applies and the limitations period is six years.   Patton discovered the misreported information on July 2010 when she tried to purchase a vehicle.   And, Defendants' manager approved and ratified a misstatement on July 2010 which is a discrete violation of the Act's prohibition on publishing false information.   Therefore, Patton's claim accrued in July of 2010.   She, therefore, had until July of 2016 to bring her claim.   Her Complaint, filed on January 8, 2015 was timely. Even if we ignore the date of discovery, the inaccurate information was reported to the credit bureaus on

### IV. Plaintiff's FCRA Claim Should Not be Dismissed.

Defendants' main argument in favor of dismissal of Plaintiff's FCRA claim is their contention that "consumers may step in to enforce their rights only after a furnisher has received proper notice of a dispute from a CRA."   (Def's Brief, RE 7, PageID 54.)   "Plaintiff only alleges that she informed Defendants of her dispute" and "to state a proper claim, Plaintiff must allege that she informed a consumer reporting agency of her dispute and that the agency informed Defendants, who then failed to act."   *Id.*   Indeed, as the Sixth Circuit has succinctly stated, "[i]f it is assumed that a private right of action exists under § 1681s-2(b), the plaintiff must show that the furnisher received notice from a consumer reporting agency, not the plaintiff, that the credit information is disputed."   *Downs v. Clayton Homes, Inc.,* 88 F.App'x 851, 853-54 (6th Cir. 2004).

Plaintiff acknowledges that, while her Complaint was awash with allegations pertaining to her attempts to advise the Defendants directly of her dispute, she did not provide any allegations of her attempts to correct the inaccuracies in her credit report through the credit reporting agencies.  As such, she seeks to remedy this malady in her Amended Complaint by including information pertaining to her attempts to correct the incorrectly reported information through the CRA's, in addition to her direct contacts with the Defendants.

Plaintiff filed complaint #51019922 with the FTC on January 27, 2014.  (Am.Comp. at ¶ 63.)  The FTC, upon information and belief, advised Defendants of the complaint.  (Am.Comp. at ¶ 63.)  As of August 6, 2014, the debt appeared as a "charge off" on Plaintiff's credit report and, therefore, Defendants failed in their duty to correct the information with the credit reporting agencies, to properly investigate the dispute, and to advise of the dispute.  (Am.Comp. at ¶ 63.)  Patton also filed numerous complaints to the statement of account with Equifax during 2014, including complaints numbered 4030032369, 4030033177, 4030044959, and 4225048022 (Am.Comp at ¶¶ 29, 34, 36; Am.Comp's Ex. F.)  Plaintiff likewise made complaints through Experian, including Complaints number 4258374618.  (Am.Comp at ¶ 36.)  Upon information and belief, these complaints and disputes were communicated to the Defendants.  (Am.Comp. at ¶ 29, 34, 36 (alleging same)).  On August 13, 2014 Plaintiff received a response to Equifax's investigation of Complaint #4425048022.  (*Id.;* Am.Comp's Ex. G.)  This document indicated that Defendants had responded to the complaint, and indicated that the account was *open* throughout 2014 and had "charged off" $7,912.  *Id.*  Plainly, Defendants violated their obligation to investigate and correct the errors in Plaintiff's account because this information remained on her credit report, even after Credit Manager Shaw's admission that the debt was "reported in error."

Defendants' argument that the claim is "barred by the two year statute of limitations" (Def's Brief, RE 7 at PageID 56) fails because the failures of investigation noted above occurred in 2014 and, therefore, within the 2 year period of the filing date of the Complaint.

## CONCLUSION

For the reasons stated herein, Plaintiff requests the following relief:

(1) DENY Defendants' Motion to Compel Arbitration,

(2) GRANT her contemporaneously filed Motion to Amend the Complaint, consider the contents thereof, and

(3) DENY Defendants' Motion to Dismiss in its entirety.

Respectfully Submitted,

Dated:  3/26/2015                             ___/s/ Collin H. Nyeholt_____
                                              Collin H. Nyeholt
                                              Fixel & Nyeholt, PLLC
                                              Attorneys for the Plaintiff

### Proof of Service

I, the undersigned, do hereby affirm, under penalty of perjury, that on today's date the attached document was served upon all parties of record via the Court's ECF system.

Dated:  3/26/2015                             ___/s/ Collin H. Nyeholt_____
                                              Collin H. Nyeholt